**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

RANDY DOTY, individually and on behalf
of all others similarly situated,

       *Plaintiff,*

    *v.*

ADT, LLC d/b/a ADT SECURITY
SERVICES, a Delaware limited liability
company, and TELESFORO AVILES, an
individual,

       *Defendants.*

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Randy Doty ("Plaintiff") brings this Class Action Complaint and Demand for Jury Trial against Defendant ADT, LLC d/b/a ADT Security Services ("ADT"), based on its intentional and negligent tortious acts in providing security services to its customers with remote-viewing capabilities, and Defendant Telesforo Aviles ("Aviles"), for using those services to spy on Plaintiff and others who resided in homes with ADT security systems. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief.

### NATURE OF THE ACTION

1.    In April of 2020, Randy Doty's wife received a terrifying phone call from ADT: the technician who had installed their indoor security camera system, Telesforo Aviles, had granted himself remote access, and had used that access an unknown amount of times to spy on Randy Doty, his wife, and their minor son in their most private and intimate moments.

1

2.      And Mr. Doty was not the only one. He soon found out that hundreds of households had experienced the same staggering invasion of privacy over at least a *seven-year* period. At fault for this breach of trust: ADT's unsecure and unmonitored "security" services.

3.      While ADT boasts that it has been protecting people for over 145 years and holds itself out as the "#1 in smart home security" it failed to even secure its own systems from massive and ongoing intrusions into its customers' private lives.

4.      ADT failed to provide the security services its customers paid for by leaving large vulnerabilities in the ADT Pulse application and, as a result, compromised the safety and security of its customers' homes and family members.

5.      The ADT vulnerability allowed any one of its technicians to grant themselves (or for them to grant anyone else, for that matter) access to a customer's ADT Pulse application and control every aspect of the customer's home security system, including surreptitiously opening locks, disarming their system, and viewing and downloading security camera footage.

6.      This vulnerability allowed Aviles—as he admitted in a later guilty plea—to watch people in their homes through the cameras for his own sexual gratification. He would watch customers naked and engaging in sexual activity, which he did hundreds and hundreds of times over, for years, without detection. *See* Factual Resume, *United States v. Aviles*, No. 20-cr-00506, dkt. 6 (N.D. Tex. Oct. 19, 2020), attached hereto as Exhibit A.)

7.      Remarkably, just three months before ADT revealed this vulnerability, ADT conducted a survey recognizing the "strong consumer expectations" of security that consumers had in their smart home products: "With many data privacy and security issues in the news, it's no surprise that 92 percent of respondents feel smart home security companies need to take measures

to protect customers' personal data and information."[1] ADT bragged that it was leading the industry in establishing "best practices" for the protection of consumer privacy, one of which was strict standards for access to data, promising that "[s]ecurity providers will only share audio or video with first responders with their customers' prior consent, or as required by law, and will not otherwise access a customer's audio or video without the customer's knowledge."[2]

8.      In a frantic effort to mitigate and hide the fact that the vulnerability in its supposedly industry-leading smart home security systems permitted an employee to spy on people in their homes, ADT began a campaign to call all affected account holders and secure a release and confidentially agreement in exchange for a monetary payment representing a fraction of the value of their claims. This effort, directed by lawyers but carried out by customer service representatives, failed to determine whether individuals were represented by counsel, and attempted to mislead them into believing that the release would cover account holders and non-account holders in the household alike.

9.      Beyond Aviles, potentially countless other unknown individuals have been accessing customers' ADT Pulse accounts and surreptitiously viewing their camera footage, for years, all around the country.

10.     The mental and emotional impact this revelation has had on every person receiving these calls from ADT is immeasurable. Moments once believed to be private and inside the sanctity of the home are now voyeuristic entertainment for a third party. And worse, those moments could

---

[1]      *ADT Survey Reveals Strong Consumer Expectations for Smart Home Privacy Protections*, ADT (Jan. 27, 2020), https://investor.adt.com/press-releases/press-release-details/2020/ADT-Survey-Reveals-Strong-Consumer-Expectations-for-Smart-Home-Privacy-Protections/default.aspx (permanent link available at https://cite.law/RNP5-BT3U).
[2]      *Id.*

have been captured, shared with others, or even posted to the Internet. ADT's failure to protect its customers irreparably destroyed their sense of security, safety, intimacy, and well-being.

## PARTIES

11.      Plaintiff Randy Doty is a natural person and a citizen of the State of Texas.

12.      Defendant ADT, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 1501 Yamato Road, Boca Raton, Florida 33431.

13.      Defendant Telesforo Aviles is a natural person and a citizen of the State of Texas.

## JURISDICTION AND VENUE

14.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendant ADT, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply in this action.

15.      This Court has personal jurisdiction over Defendant ADT because Defendant ADT conducts business in Florida and has its headquarters in this District. This Court has personal jurisdiction over Defendant Aviles because Defendant Aviles conducts business in Florida through his employment with Defendant ADT.

16.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant ADT maintains its headquarters and conducts significant business in this District.

## COMMON FACTUAL ALLEGATIONS

### I.     *ADT Promises Safety and Security to Consumers.*

17.      ADT is a home security company that touts its longstanding expertise in security and claims to have been providing security services since the 19th century. According to ADT, it

is "America's #1 smart home security provider." ADT provides residential security systems and monitoring plans that purportedly provide "immediate detection" to "help protect you from intrusion". In short, ADT promises that it is "committed to your security."[3]

18.　　ADT markets and sells a comprehensive security system package that includes the hardware necessary to operate a home security system, the monitoring services that detect home intrusions and alert the police, and the security system installation.

19.　　ADT offers various tiers of its home security systems at different price points. The basic tier, for example, features security monitoring equipment with 24/7 alarm monitoring while the highest tier home security package includes various convenience and home automation features.

20.　　One of the highest tier home security packages is ADT Pulse. ADT Pulse allows consumers to "check on your home - even if you're away" by giving them remote access to control their home security system from a mobile application or a web browser portal. Specifically, consumers can arm and disarm their home security systems, remotely lock and unlock doors, view live camera footage, and control various smart home devices like a thermostat and lights. *See* Figure 1, showing a screenshot of ADT's marketing materials for ADT Pulse.[4]

---

[3]　　ADT Services | Free In-Home Consultation, Expert Installation and Repairs, Personal Customer Support, https://www.adt.com/services (last visited Apr. 1, 2021).

[4]　　ADT Pulse® | Official ADT Smart Home Automation System, https://www.adt.com/pulse (last visited Apr. 1, 2021).

## Check on Your Home – Even If You're Away



**Arm & Disarm Your System**

Turn your home alarm on or off anywhere using your smartphone.



**See Live Camera Footage**

Check on your family from your ADT security camera using your mobile device.



**Lock and Unlock Your Doors**

Double-check your home's smart locks and garage doors no matter where you are.



**Control Your Smart Home Gadgets**

Connect your smart home devices to check on your home from virtually anywhere.

(**Figure 1.**)

21.     Consumers must purchase various smart devices from ADT to reap the benefits of the ADT Pulse service and all the advertised remote accessibility features. ADT touts that its smart home features are not only more convenient to consumers, but they provide "smarter security." For example, ADT claims that the purchase of its smart locks for use with the ADT Pulse system will result in a "whole new level of security and convenience…" as shown in Figure 2.[5]

---

[5]     ADT Home Security | ADT Smart Locks, https://www.adt.com/locks (last visited March 18, 2021).

**More convenience.
Smarter security.**

Smart door locks add a whole new level of
security and convenience to a smart ADT
security system, allowing you to easily let
people in – or keep them out – remotely.

(**Figure 2.**)

22.     Most importantly, ADT encourages consumers to purchase video cameras for both
outdoor and indoor uses to "watch over the things in your life you value most."[6] The indoor
cameras, according to ADT, are specifically intended to "check in on your kids" and can be set up
to stream and capture video clips of events.[7]

23.     Consumers use the ADT Pulse mobile application to "see live camera footage" and
to "check on your family from your ADT security camera using your mobile device." Furthermore,
consumers are able view stored video clips from their security cameras on their phones via the
ADT Pulse mobile application.[8]

24.     To use the ADT Pulse smart home features—like remotely viewing security camera
footage, disarming a security system, or unlocking smart locks—consumers must login into the
ADT Pulse mobile application or the ADT Pulse web browser portal by using their username and

---

[6]     Wireless Home Security Cameras & Video Surveillance Cameras | ADT,
https://www.adt.com/security-cameras (last visited Apr. 1, 2021).

[7]     Shop ADT® Indoor Home Security Cameras | ADT, https://www.adt.com/indoor-
security-camera (last visited Apr. 1, 2021).

[8]     *Supra* note 4.

password. Anyone with valid login credentials, like a family member, can access and control the security system remotely.

25.     For the ADT Pulse system to function correctly, an ADT technician needs to perform the system installation and configuration.

26.     Each new security system installation comes with a "worry-free professional installation" where "highly-trained ADT technicians will set-up your ADT security system so you don't have to."[9] ADT technicians will also test the security system and assist the consumer in connecting their smart phone to the ADT security system for use with ADT Pulse, as shown in Figure 3.[10]



**Get Professional Installation and Integration**

Our highly trained, certified technicians will professionally install your ADT security system. Once installed, your technician will test your system to be sure it is working properly, and show you how it works for easy use from day one. They can also assist you with connecting your smartphone to the ADT app, to control ADT on-the-go.

(**Figure 3.**)

27.     ADT further promotes its security services by stating that its technicians are what sets them apart from the competitors in being able to earn its customers' trust and protect the most

---

[9]     ADT® | Compare Home Security System Packages | 2020, https://www.adt.com/compare (last visited Apr. 1, 2020)

[10]     *Supra* note 4.

important people in their lives. According to its website: "Our people are dedicated to taking care of the people and property you value most in your life. Our customers trust us to help protect those things that cannot be replaced." *See* Figure 4, showing a screenshot from ADT's website.[11]

## Our people set us apart

Our people are dedicated to taking care of the people and property you value most in your life. Our customers trust us to help protect those things that cannot be replaced.

(**Figure 4.**)

28.     Moreover, ADT knows precisely how important the security of smart home devices is to consumers. ADT went out of its way to commission a survey of more than 1,200 consumers in December 2019, and found that 92% of consumers felt that "smart home security companies [like ADT] need to take measures to protect customers' personal data and information." And ADT went so far as to issue a press release dedicated to saying it was doing just that, in order to "maintain consumer trust and promote responsible data privacy practices within the industry."[12]

29.     The greatest concern that consumers had, revealed by ADT's survey, was "hacking." In response to those concerns, ADT boasted that it was leading the industry in creating a "Consumer Privacy Initiative," to create "clear guiding principles and best practices" for how

---

[11]     Why ADT has the Best Home Security and Customer Service | ADT, https://www.adt.com/security-benefits (last visited Apr. 1, 2020).

[12]     *ADT Survey Reveals Strong Consumer Expectations for Smart Home Privacy Protections*, ADT (Jan. 27, 2020), https://investor.adt.com/press-releases/press-release-details/2020/ADT-Survey-Reveals-Strong-Consumer-Expectations-for-Smart-Home-Privacy-Protections/default.aspx (permanent link available at https://cite.law/RNP5-BT3U).

security providers "manage consumer data and protect their privacy." Those principles included "Privacy by Design," promising to "embed[]" privacy "in all areas of the security industry," which "begins with the design of the products used to help protect and connect customers." They also included, specifically, "Handling of Audio and Video," claiming that security providers would share audio or video only with prior consent and would otherwise never "access a customer's audio or video without the customer's knowledge."[13]

## II.    *ADT Failed to Detect a Seven-Year-Long Breach of its Systems That, at the Very Least, Resulted in an ADT Employee Improperly Accessing Customers' Accounts.*

30.    Unfortunately for all of ADT's Pulse customers and those living in homes with ADT Pulse security systems, a vulnerability in the Pulse system completely obliterates all of ADT's promises of security and protection.

31.    On or around April 23, 2020, ADT began to contact some of its customers to inform them that a vulnerability in the ADT Pulse system had allowed unauthorized users to access customers' ADT Pulse accounts as if they were a regular user. In other words, an unauthorized user could remotely arm and disarm security systems, access smart home devices, and view and download security camera footage, including footage from indoor cameras designed to, among other things, protect their children.

32.    In fact, ADT's investigation revealed that at least one ADT employee in the Dallas-Fort Worth, Texas area, named Telesforo Aviles, had access to more than *200 different customers'* ADT Pulse accounts for *the last seven years*. According to an ADT spokesperson, Aviles was able to add—and, in fact, did add—his own personal email address to customers' accounts, allowing him to remotely login to a customer's account using his own unauthorized credentials.

---

[13]    *Id.*

33.     Aviles was ultimately charged by the United States with one count of fraud and related activity in connection with computers, in violation of 18. U.S.C. § 1030(a)(2)(C) and (c)(2)(B)(ii), due to his accessing of ADT Pulse customer accounts. *See* Information, *United States v. Aviles*, 20-cr-00506, dkt. 1 (N.D. Tex. Oct. 19, 2020), attached hereto as Exhibit B.

34.     Subsequently, Aviles plead guilty to this charge on October 19, 2020. Plea Agreement, *United States v. Aviles*, 20-cr-00506, dkt. 4 (N.D. Tex. Oct. 19, 2020), attached hereto as Exhibit C. In support of his guilty plea, Aviles agreed and stipulated to multiple facts surrounding his access of ADT Pulse customer accounts. *See* Factual Resume, Ex. A.

35.     Aviles admitted that when ADT technicians installed the ADT Pulse system in customer homes, ADT permitted them to add their ADT employee email to the application for access to the security system. Through this process, Aviles would add his personal email to a given customer's ADT Pulse system during installation. *See* Factual Resume, Ex. A, ¶¶ 3–4.

36.     Over the course of at least five years, Telesforo Aviles accessed customer's ADT Pulse systems and viewed their interior and exterior security footage for the purposes of sexual gratification. This included watching videos captured on the ADT Pulse system that depicted naked women and couples engaging in sexual activity inside of their homes, without the customer's consent. *See id.*, ¶¶ 5–6.

37.     This type of access admitted to by Aviles could only occur because ADT failed to implement adequate procedures to ensure that technicians removed their access to customer's ADT Pulse systems after installation. Further, ADT failed to implement procedures that would prevent non-household members from adding non-household email addresses.

38.     Similarly, ADT failed to monitor consumers' accounts and promptly alert them any time a new email was added to their accounts. Countless checks could have been in place to prevent

or at least stop this conduct. Instead, this breach came to light only by luck and happenstance: a customer, reporting a technical issue, inadvertently revealed the unwanted third-party access. But for that event, ADT would be unaware of this invasive conduct and it would continue unabated to this day (and likely expanding to new households).

39.     As such, countless other ADT technicians and/or employees could have taken advantage of ADT's lax security and granted themselves unfettered access to other customer accounts—entirely unbeknownst to both the customer and to ADT.

40.     Although ADT claims it has implemented procedures to prevent similar incidents in the future, it is already too late for an unknown number of households whose accounts and security camera footage have already been accessed and potentially exploited.

## FACTS SPECIFIC TO PLAINTIFF DOTY

41.     Mr. Doty's household has been a long-time ADT security customer. In approximately 2014, Mr. Doty's wife upgraded her account to the ADT Pulse system which included installing security cameras inside her home. ADT represented to Mr. Doty's wife that this upgrade would enhance her household's security.

42.     Shortly thereafter, Aviles installed the ADT Pulse system, including an indoor security camera with a wide-angle view that provided a visual of a bathroom, entryway, family room and dining space, stairs, and into the master bedroom.

43.     On April 23, 2020, a phone call from ADT destroyed whatever security and safety its security system promised. An ADT "Concierge Specialist" called Mr. Doty's wife to explain that one of its technicians (who they did not name) had gained access to her account and therefore had access to her household's camera, potentially viewing Mr. Doty, his wife, and their minor son,

for an unknown amount of time. ADT claimed it was unknown how many times this technician accessed their camera.

44.     In an email later that day, ADT Concierge Representative Wayne Walker described it as "a difficult message to hear." Difficult is, of course, woefully inadequate to truly describe Plaintiff's loss of security, loss of safety, humiliation, and anger.

45.     Based upon the cameras' wide-angle lens and placement, ADT's employee had an opportunity to watch at least the following events:

    a.   Mr. Doty, his wife, and his minor son nude;

    b.   Mr. Doty, his wife, and his minor son in various states of undress;

    c.   Mr. Doty, his wife, and his minor son getting ready for bed; and

    d.   Moments of physical intimacy.

46.     Immediately after the call, Mr. Doty's wife disabled the ADT camera in their home. Mr. Doty's wife expended significant time addressing the current and future consequences of the exposure enabled by ADT, including, but not limited to, removing ADT security hardware, and researching additional surveillance and security devices and services.

47.     Prior to April 23, 2020, Mr. Doty and his wife never received any call, text, email, or notification of any kind informing them that another user was added to the ADT Pulse account or that a third-party user accessed the ADT Pulse account.

## CLASS ALLEGATIONS

48.     **Class Definition**: Plaintiff Randy Doty brings this action on behalf of himself and a class of similarly situated individuals, as well as a sub-class of those individuals, defined as follows:

**Class:** All individuals in the United States who (1) reside in a household with an ADT Pulse security system but are not the account holder; and (2) where that security system

was remotely accessed by an employee or agent of Defendant ADT without authorization from the account holder.

**Sub-Class:** All individuals in the United States who (1) reside in a household with an ADT Pulse security system but are not the account holder; and (2) where that security system was remotely accessed by Telesforo Aviles without authorization from the customer.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and the members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated by a court of law on the merits; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

49.    **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consist of over 40 individuals. Members of the Class can be easily identified through Defendant ADT's records. While the exact number of members of the Sub-Class is unknown, there are over 200 households affected by Aviles' conduct that have been identified by Defendant ADT, and the exact membership of the Class can be identified through Defendant ADT's records.

50.    **Commonality**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

a.   Whether Defendant ADT's conduct constitutes negligence;

b.   Whether Defendant ADT's conduct constitutes gross negligence;

c.  Whether Defendant ADT's conduct constitutes an intrusion upon seclusion;

d.  Whether Defendant ADT's conduct constitutes intentional infliction of emotional distress;

e.  Whether Defendant ADT's conduct entitles the Class to privacy monitoring; and

f.  Whether Defendant ADT's conduct constitutes negligent hiring, supervision, and retention.

There are many questions of law and fact common to the claims of Plaintiff and the other members of the Sub-Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

a.  Whether Defendant Aviles's conduct constitutes intrusion upon seclusion; and

b.  Whether Defendant Aviles's conduct constitutes intentional infliction of emotional distress.

51.  **Typicality:** Plaintiff's claims are typical of other members of the Class and Sub-Class, in that Plaintiff and the members of the Class and Sub-Class sustained damages arising out of Defendants' uniform wrongful conduct.

52.  **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and Sub-Class and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Class or Sub-Class, and Defendants have no defenses unique to Plaintiff.

53.  **Predominance and Superiority**: This case is also appropriate for class certification because Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Class and Sub-Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation

necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class and Sub-Class to obtain effective relief from Defendants' misconduct. Even if members of the Class and Sub-Class could sustain such individual litigation, it would still not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff Doty and the Class against Defendant ADT)

54.     Plaintiff incorporates paragraphs 1–53 as if fully set forth herein.

55.     Defendant ADT had full knowledge of the purpose for which its security cameras were being used and the sensitivity of the people and things the cameras were designed to secure and protect—that which "matters most" to their clients. ADT also knew the types of harm that Plaintiff and the members of the Class could and would suffer if the integrity of the security system was compromised.

56.     ADT had a duty to exercise reasonable care in ensuring that all ADT security systems were secure, safe to use, and inviolable by unauthorized parties. This duty includes, among other things, ensuring that reasonable and proper protocols and safeguards are in place so that consumers' security cameras are not easily compromised by unauthorized users.

57.     Defendant ADT, by and through its agents, employees, and independent contractors, was negligent in its acts and/or omissions by, among other things, allowing technicians to create authorized user accounts, and by failing to discover that its employees could make and

did make themselves authorized users gaining unauthorized access to the ADT Pulse account connected to their home, thereby allowing surreptitious videos and images to be viewed and taken of Plaintiff in his home.

58.     Plaintiff and the members of the Class were the foreseeable and probable victims of any inadequate security practices and procedures. ADT knew of or should have known of the inherent risks of allowing ADT cameras to be set up and used without adequate security protocols and safeguards.

59.     Defendant ADT further knew or should have known that: (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a reasonable expectation of privacy in being partially and fully naked, engaging in consensual intimate activity, and having private conversations in a private home; (3) the recordings were taken without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which ADT and Aviles had no right or authorization to view, use, disseminate, or disclose; and (5) the viewing of these private acts and occasions constitutes a substantial violation of Plaintiff's right of privacy.

60.     Beyond ordinary negligence, Defendant ADT was grossly negligent because the acts and omissions of Defendant ADT and its employee and agents were more than momentary thoughtlessness or inadvertence. Rather the conduct, when viewed objectively from the standpoint of Defendant ADT at the time of these events, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff. Moreover, Defendant ADT had subjective knowledge of the risk of employees gaining unauthorized access to clients' cameras but failed to disclose to Plaintiff the vulnerability of their monitoring systems and the ability of ADT

employees to monitor and observe their home without their consent, and acted with conscious indifference to the rights, safety, and welfare of their clients.

61.     ADT's own actions and inactions created a foreseeable risk of harm to Plaintiff and the members of the Class. ADT's misconduct included, but was not limited to, its failure to sell security systems with sufficiently robust security protocols to prevent unauthorized users from gaining access to the cameras and failing to inform Plaintiff and the members of the Class when unknown individuals added their email addresses to customer accounts.

62.     ADT was in a position to protect against the harm suffered by Plaintiff and the members of the Class and had a duty to reasonably protect Plaintiff and the Class from invasions of privacy through unauthorized access of the ADT Pulse system.

63.     ADT, through its actions, unlawfully breached its duty to Plaintiff and the members of the Class by failing to ensure their cameras and set up procedures were sufficiently robust to protect against unauthorized use.

64.     As a result of ADT's negligence, Plaintiff and the members of the Class have suffered and will continue to suffer damages and injury including, but not limited to: mental anguish and suffering in the form of anxiety, stress, loss of security, fear, loss of safety, humiliation, and anger; the time spent monitoring and addressing the current and future consequences of the exposure enabled by ADT; and the necessity to engage legal counsel and incur attorneys' fees, costs, and expenses.

65.     Further, because ADT's acts and omissions resulted from gross negligence, exemplary damages should be awarded against ADT in an amount to be determined by the jury in this case. Moreover, exemplary damages should be awarded without limitation, as set forth in Tex. Civ. Prac. & Rem. Code § 41.008(c).

## SECOND CAUSE OF ACTION
### Intrusion Upon Seclusion
### (On Behalf of Plaintiff Doty and the Class against Defendant ADT)

66.     Plaintiff incorporates the foregoing paragraphs 1–53 as if fully set forth herein.

67.     ADT intentionally intruded upon Plaintiff's and each of the Class members' seclusion by creating the means and opportunity for its employees to spy on Plaintiff and the Class in one of their most private spaces—their homes—and providing Aviles and potentially others with round-the-clock access to their most intimate moments. Specifically, ADT's policy of allowing technicians to add their emails to customer's ADT Pulse accounts created this opportunity. Indeed, ADT had an affirmative duty not to let unauthorized third parties gain access to these spaces.

68.     ADT's creation of this opportunity and failure to stop such access is highly offensive to a reasonable person as it reveals intimate private details about Plaintiff and each of the Class members and the activities they participate in inside the privacy of their own homes.

69.     ADT is also liable for the actions of its agents who accessed the security systems in Plaintiff's and the Class's homes, which was done in the normal and routine course and scope of their employment.

70.     ADT's intrusion upon the Plaintiff's and the Class members' seclusion caused Plaintiff and the Class members mental anguish and suffering in the form of anxiety, loss of security, loss of safety, humiliation, and anger.

## THIRD CAUSE OF ACTION
### Negligent Hiring, Supervision and Retention
### (On Behalf of Plaintiff Doty and the Class against Defendant ADT)

71.     Plaintiff incorporates the foregoing paragraphs 1–53 as if fully set forth herein.

72.     At all relevant times, Telesforo Aviles was ADT's employee and/or agent.

73.     Whenever in this Complaint it is alleged that ADT did any act or thing, it is meant that each of ADT's officers, agents, servants, employees, or representatives did such act and/or that at the time such act or thing was done, it was done with the full authorization or ratification of ADT or was done in the normal and routine course and scope of employment of each of ADT's officers, agents, servants, employees, or representatives.

74.     ADT had the opportunity and duty to screen its employees, including Aviles, to ensure they were fit to perform the duties asked of them.

75.     ADT knew or should have known Aviles was incompetent or unfit. Nonetheless, ADT made the reckless decision to hire and retain Aviles as a technician.

76.     ADT and its agents, servants, and employees, who were at all times acting in the course and scope of their employment, were guilty of negligence toward Plaintiff. Defendant ADT is further liable for the negligent acts of their agents, servants, or employees, including Aviles, under the legal doctrine of respondeat superior. At all relevant times, Aviles was an agent apparent or ostensible agent of Defendant ADT.

77.     ADT's negligence was a proximate cause of Plaintiff's and Class members' injuries and damages, including, but not limited to, ADT's negligence in:

   a.   Failing to perform due diligence in contacting Aviles's prior employers;

   b.   Failing to adequately evaluate Aviles's mental state prior to hiring;

   c.   Any and all actions and omissions as may be proven at trial;

   d.   Negligently hiring Aviles in a position allowing him to have access to sensitive client information;

   e.   Negligently allowing Aviles to access sensitive client information when Defendant ADT knew, or in the exercise of ordinary care should have known, that Aviles was

unfit;

f.   Negligently retaining Aviles in its employ in a position that provided him with access to sensitive client information;

g.   Negligently and inadequately supervising its employees;

h.   Failing to create and/or enforce safety rules, polices, and procedures governing employee conduct regarding access to clients' cameras and other sensitive information;

i.   Failing to warn Plaintiff of the inappropriate and substandard hiring and retention, training, and supervision of their employees; and

j.   Negligently allowing Aviles to accomplish the tort upon Plaintiff by the existence of his agency relationship with Defendant ADT.

78.   These actions and omissions of ADT singularly, or in combination with others, proximately caused damages to Plaintiff and the Class, including invasions of privacy, as well as mental anguish and suffering in the form of anxiety, stress, loss of security, fear, loss of safety, humiliation, and anger.

**FOURTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**(On Behalf of Plaintiff Doty and the Class against Defendant ADT)**

79.   Plaintiff incorporates the foregoing paragraphs 1–53 as if fully set forth herein.

80.   At all times herein, Aviles acted intentionally, maliciously, and without justification, to gain unauthorized access to Plaintiff's private camera, potentially including video of Plaintiff partially or completely naked and engaging in intimate and other private activities, when Aviles knew or should have known that Plaintiff would suffer severe emotional distress as a result.

81.     The conduct by Aviles was intentional, malicious and done for the purpose of causing, or was known by Aviles to be likely to cause, Plaintiff to suffer severe emotional distress, and was done with the wanton and reckless disregard of the consequences to Plaintiff.

82.     Defendant ADT had a duty to exercise reasonable and ordinary care and caution in and about the management, maintenance, supervision, control, and operation of its systems and each of their employees, agents, and independent contractors, all to the benefit of clients and persons like Plaintiff.

83.     Defendant ADT, by and through its agents, employees, and independent contractors, was reckless in its acts and/or omissions by, among other things, having a policy that allowed technicians to add their email addresses to customers' ADT Pulse accounts during installation, allowing technicians to create authorized user accounts, and by failing to discover that Aviles made himself an authorized user and gained unauthorized access to Plaintiff's home camera, thereby allowing surreptitious videos and images to be viewed and taken of Plaintiff in the privacy of his home.

84.     Defendant ADT knew or should have known that: (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a reasonable expectation of privacy in being partially and fully naked and engaging in consensual intimate activity, and having private conversations, in a private home; (3) the recordings were taken without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which ADT and Aviles had no right or authorization to view, use, disseminate, or disclose; and (5) the viewing of these private acts and occasions constitutes a substantial and outrageous violation of Plaintiff's right to privacy.

85.     These acts were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure, or annoy, such as to constitute oppression, fraud, or malice. ADT acted outrageously and beyond all reasonable bounds of decency, and intentionally inflicted severe emotional distress upon Plaintiff, to his detriment.

86.     As a direct and proximate result of ADT's aforementioned acts and omissions, Plaintiff suffered an invasion of privacy, emotional injury, mental damage, loss, harm, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof. These damages are continuing in nature and will be suffered in the future.

### FIFTH CAUSE OF ACTION
### Privacy Monitoring
### (On Behalf of Plaintiff Doty and the Class against Defendant ADT)

87.     Plaintiff incorporates the foregoing paragraphs 1–53 as if fully set forth herein.

88.     Plaintiff and the Class suffered extreme invasions of their privacy in that ADT's agent or agents have accessed the security systems installed in their homes, including cameras inside their homes. ADT's agents were able to surreptitiously see and record their most intimate moments in a highly protected and personal space.

89.     ADT proximately caused Plaintiff's and the Class's privacy to be violated by designing and maintaining its smart home security products with obvious and significant security vulnerabilities, through which ADT's employees' surreptitious access to the cameras in Plaintiff's and the Class's homes was a predictable outcome.

90.     The invasion of privacy that Plaintiff and the Class suffered exposes them to even more alarming, compounding harms: if still or video recordings were made from those camera feeds, they can be distributed via the Internet to yet more people. Regrettably, the Internet has long permitted the establishment of well-organized groups for the trading or posting of illicit (or even

illegal) material that serves the prurient interest of that group without the knowledge or permission of the subjects.[14] Plaintiff's and the Class's risk of having their private lives exposed on the Internet is significantly increased because of ADT's actions.

91.     Swift detection of the content on the Internet is necessary to contain its spread. Each time an image or video is sent to another person, the possibility of removing the image or even mitigating the spread is reduced.

92.     Commercial "takedown services" are available to monitor the spread of images and video, and, for a greater price, will try to get them taken down. In some situations, Plaintiff and the Class may even need to hire counsel. Absent ADT's actions, these services would be unnecessary. These services are broadly accepted as necessary because individuals cannot reasonably monitor the entire Internet or force individuals to take this material down.

93.     Plaintiff and the Class seek injunctive relief, requiring ADT to create a fund sufficient to cover the costs of commercial and/or legal services needed to remedy the invasion of privacy that they have suffered, including (1) monitoring for the distribution of images or video from their homes, (2) taking down any such media that is posted, and (3) providing any such further relief as the Court deems equitable and just.

**SIXTH CAUSE OF ACTION**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiff Doty and the Sub-Class against Defendant Aviles)**

94.     Plaintiff incorporates the foregoing paragraphs 1–53 as if fully set forth herein.

---

[14]     Some groups operate more publicly than others, both are of concern here. *E.g.*, FEDERAL TRADE COMMISSION, *FTC, Nevada Obtain Order Permanently Shutting down Revenge Porn Site MyEx* (June 22, 2018), https://www.ftc.gov/news-events/press-releases/2018/06/ftc-nevada-obtain-order-permanently-shutting-down-revenge-porn/.

95.     Defendant Aviles intentionally intruded upon Plaintiff's and each of the Sub-Class members' seclusion by spying on Plaintiff and the Sub-Class in one of their most private spaces, their homes, and in their most intimate moments.

96.     Defendant Aviles's spying on Plaintiff and the Sub-Class is highly offensive to a reasonable person as it reveals intimate private details about Plaintiff and each of the Sub-Class members and the activities they participate in inside the privacy of their own homes.

97.     Defendant Aviles's intrusion upon the Plaintiff's and the Sub-Class members' seclusion caused Plaintiff and the Sub-Class members invasions of privacy, as well as mental anguish and suffering in the form of anxiety, loss of security, loss of safety, humiliation, and anger.

### SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (On Behalf of Plaintiff Doty and the Sub-Class against Defendant Aviles)

98.     Plaintiff incorporates the foregoing paragraphs 1–53 as if fully set forth herein.

99.     At all times herein, Aviles acted intentionally, maliciously, and without justification, to gain unauthorized access to Plaintiff's private camera, potentially including video of Plaintiff partially or completely naked and engaging in intimate and other private activities, when Aviles knew or should have known that Plaintiff would suffer severe emotional distress as a result.

100.    The conduct by Aviles was intentional, malicious, and done for the purpose of causing, or was known by Aviles to be likely to cause, Plaintiff to suffer severe emotional distress, and was done with the wanton and reckless disregard of the consequences to Plaintiff.

101.    Defendant Aviles knew or should have known that: (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a reasonable expectation of privacy in being partially and fully naked and engaging in consensual

intimate activity, and having private conversations, in a private home; (3) the recordings were taken without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which Aviles had no right or authorization to view, use, disseminate, or disclose; and (5) the viewing of these private acts and occasions constitutes a substantial and outrageous violation of Plaintiff's right to privacy.

102.    These acts were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure, or annoy, such as to constitute oppression, fraud, or malice. Aviles acted outrageously and beyond all reasonable bounds of decency, and intentionally inflicted severe emotional distress upon Plaintiff, to his detriment.

103.    As a direct and proximate result of Aviles's aforementioned acts and omissions, Plaintiff suffered an invasion of privacy, emotional injury, mental damage, loss, harm, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof. These damages are continuing in nature and will be suffered in the future.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Randy Doty, individually and on behalf of the Class of similarly situated individuals, prays for the following relief against Defendant ADT:

A.    Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as the representative of the Class, and appointing his counsel as class counsel;

B.    Declaring that ADT's actions as set out above constitute negligent invasion of privacy, gross negligence, intrusion upon seclusion, negligent hiring, supervision and retention, and intentional infliction of emotional distress;

C.    Awarding damages, including statutory, exemplary, and punitive damages where applicable;

D.      Awarding injunctive relief in the form of privacy monitoring;

E.      Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

F.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

G.      Awarding such other injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

H.      Awarding such other and further relief as the Court deems reasonable and just.

**FURTHERMORE,** Plaintiff Randy Doty, individually and on behalf of the Sub-Class of similarly situated individuals, prays for the following relief against Defendant Aviles:

I.      Certifying this case as a class action on behalf of the Sub-Class defined above, appointing Plaintiff as the representative of the Sub-Class, and appointing his counsel as class counsel;

J.      Declaring that Aviles's actions, as set out above constitute intrusion upon seclusion and intentional infliction of emotional distress;

K.      Awarding damages, including exemplary and punitive damages where applicable;

L.      Awarding Plaintiff and the Sub-Class their reasonable litigation expenses and attorneys' fees;

M.      Awarding Plaintiff and the Sub-Class pre- and post-judgment interest, to the extent allowable;

N.      Awarding such other injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Sub-Class; and

O.      Awarding such other and further relief as the Court deems reasonable and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**RANDY DOTY**, individually and on behalf of all others similarly situated,

Dated: April 2, 2021

By: /s/Christopher Michael Brown
One of Plaintiff's Attorneys

Jay Edelson*
jedelson@edelson.com
Benjamin H. Richman*
brichman@edelson.com
J. Eli Wade-Scott*
ewadescott@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Matthew R. McCarley*
mmccarley@fnlawfirm.com
Christopher Michael Brown
cbrown@fnlawfirm.com
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel: 214.890.0711
Fax: 214.890.0712

Amy M. Carter*
amy@clgtrial.com
Heather V. Davis*
hdavis@clgtrial.com
CARTER LAW GROUP, P.C.
5473 Blair Rd.
Dallas, Texas 75231
Telephone: (214) 390-4173

*Pro Hac Vice admission pending